# In the United States Court of Federal Claims

No. 15-1049C

(Filed: October 31, 2016)

| | |
|---|---|
| CERTIFIED CONSTRUCTION CO. OF KENTUCKY, LLC, <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br><br> Defendant. | Keywords: Contract Disputes Act; Breach of Contract; Requirements Contract; Scope of Requirement; Maximum-Order Limitation |

*Thomas E. Roma, Jr.*, Ackerson & Yann, PLLC, Louisville, KY, for Plaintiff.

*Igor Helman*, Trial Attorney, Commercial Litigation Branch, with whom were *Donald E. Kinner*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, U.S. Department of Justice, Washington, DC, for Defendant. *Thomas S. Hong*, Litigation Attorney, General Litigation Division, U.S. Army Legal Services Agency, Ft. Belvoir, VA, Of Counsel.

## OPINION AND ORDER

**KAPLAN, Judge.**

In this breach-of-contract case, Plaintiff Certified Construction of Kentucky, LLC (Certified) claims that the government breached three requirements contracts Certified held for completing concrete pavement and/or placement work at the U.S. Army base at Ft. Knox, Kentucky. In particular, it contends that the government diverted work within the scope of the contracts to other contractors, thus breaching the contracts and entitling Certified to an award of lost profits. The government has moved for summary judgment on the claims.

For the reasons discussed below, the Court concludes that—contrary to the government's arguments—the contracts at issue in this case were, in fact, enforceable requirements contracts because each granted Certified an exclusive right to perform the work falling within its scope. Further, based on the plain language of the contracts, the Court has determined that the work to be performed under the contracts included concrete pavement work, but did not extend to structural concrete work. However, because the government has not demonstrated the absence of any genuine issue of material fact with respect to whether any particular projects that may have been performed by other

contractors fell within this category, it is not entitled to summary judgment as to Certified's claims. Accordingly, the government's motion is **DENIED**.

## BACKGROUND[1]

Certified is a long-time contractor for the U.S. Department of the Army (Army). See Pl.'s Resp. to Mot. for Summ. J. (Pl.'s Resp.) at 2–3, ECF No. 25. From 1998 until 2010, it held several contracts to perform concrete placement, asphalt surface treatment, and pavement marking projects at the Army's base at Ft. Knox, Kentucky. Id.; see also Pl.'s Resp. App. at PA 001[2] (affidavit of Allan W. Buckles, Certified's president). This action concerns three contracts awarded to Certified covering the years from 2006 through 2010. Compl. ¶¶ 5–8; Pl.'s Resp. at 3–6.

### I. The 2006 Contract

On October 26, 2005, the Army awarded Certified a "requirements-type contract for concrete placement, asphalt surface treatments and pavement markings" at Ft. Knox. Def.'s Mot. for Summ. J. (Def.'s Mot.) App. at A127–28. The contract's initial term was to run until October 31, 2006. Id. at A127.

The contract's "Scope" section described the contractor's work as follows:

> The contractor shall furnish all labor, materials, equipment, transportation, traffic control and supervision for construction and repair of asphalt pavement work (to include new asphalt pavement, asphalt overlays, asphalt surface treatments, etc.) and concrete pavement work (to include concrete services for roads, airfields, test sites, walks, retaining walls, parking lots, appurtenances, etc.) in family housing and post areas at Fort Knox, Kentucky. Also included is the placement of traffic control markings on or along existing and new pavements.

Id. at A177. The same section of the contract also noted that "[t]he contract will be a requirements-type contract to be ordered on individual delivery orders"; and that, with respect to concrete work, the services ordered might "include but not be limited to" the following:

---

[1] Unless otherwise specified, the facts set forth in this section are undisputed.

[2] Throughout this Opinion, citations to the evidence submitted by the parties will refer to the Bates-stamped page numbers found in the parties' respective appendices—e.g., "Pl.'s Resp. App. at PA 001" for the first page of Certified's appendix and "Def.'s Mot. App. at A1" for the first page of the government's appendix.

- Base course restoration
- Crack repair
- Joint Repair
- Concrete headwalls
- Complete restoration
- Concrete Curb & Gutter
- Concrete Porches, Steps and Patios
- Slab Jacking
- Concrete Sidewalk
- Rapid set concrete repair
- Culverts and Drainage structures
- Repair or construction of roads
- Airfield surfaces, walkways, retaining walls, parking lots, etc.
- Concrete footings

Id.

Several other provisions further delineated the contract's scope. Thus, in a clause in the contract's "Important Notes" section, the government "reserve[d] the right to perform the work included in this contract with in-house personnel, Job Order contracting,[3] troop labor, or by another contract where concrete placement, asphalt surface treatment, or pavement marking is incidental to other work." Id. at A172–73.

The contract also incorporated two provisions taken from the FAR. Id. at A174. The first, titled "Order Limitations," noted that the contractor was "not obligated to honor" any order of less than $2,000 for a single item; any order of more than $200,000 for any single item; or any order of more than $400,000 for a combination of items. Id. In addition, the provision stated that "[i]f this is a requirements contract . . . the Government is not required to order a part of any one requirement from the Contractor if that requirement exceeds the maximum-order limitations [set forth] above." Id.

The second, titled "Requirements. (OCT 1995) -- Alternate I (APR 1984)," stated that "[t]his is a requirements contract" and that "[t]he estimated quantities are not the total requirements of the Government . . . but are estimates of requirements in excess of the quantities that the [government] may itself furnish within its own capabilities." Id. Thus, it continued, "[e]xcept as this contract otherwise provides, the Government shall order from the Contractor all of [its] requirements for supplies and services specified in the [contract] that exceed the quantities that the [government] may itself furnish within its own capabilities." Id. Further, the provision stated that "[t]he Government is not required to purchase from the Contractor requirements in excess of any limit on total orders under this contract." Id.

## II.   The 2008 Contract

After exercising options extending the 2006 contract through April 30, 2008, see Compl. ¶¶ 5–6, the Army entered into another one-year contract with Certified on May 15, 2008. Def.'s Mot. App. at A187–88. The 2008 contract was identical to the 2006

---

[3] According to the government, "Job Order Contracting (JOC) involves cont[r]acts for the small scale, non-programmed military construction projects that are a regular feature of garrison maintenance and upgrades," and "[t]he scope of the JOC includes paving activities associated with construction projects." Def.'s Mot. at 6 n.3.

3

contract in many material respects, but included some changes. Thus, in addition to "concrete placement, asphalt surface treatments, [and] pavement markings," the 2008 contract also covered "site preparation" work. Id. at A187. The contract's "Scope" section was also modified somewhat. Id. at A290. Specifically, the "Scope" section now provided that:

> The contractor shall furnish all labor, materials, equipment, transportation, traffic control and supervision for construction and repair of asphalt pavement work (to include new asphalt pavement, asphalt overlays, asphalt surface treatments, etc.), concrete pavement work (to include concrete <u>placement</u> for roads, airfields, test sites, walks, retaining walls, parking lots, appurtenances, etc.) <u>and site work associated with the placement of concrete and asphalt or stand alone site work (to include excavation, placing fill, finish grading, turf re-establishment, etc.) for completion of a total project</u> in post areas at Fort Knox, Kentucky. Also included is the placement of traffic control markings on or along existing and new pavements <u>and incidentals as listed below.</u>

Id. (emphasis added to changes made from the 2006 contract).

As with the 2006 contract, the 2008 contract included an "Important Notes" section with a clause stating that the government "reserve[d] the right to perform the work included in this contract with in-house personnel, Job Order contracting, troop labor, or by another contract where concrete placement, asphalt surface treatment, or pavement marking is incidental to other work." Id. at A285. Unlike the 2006 contract, though, the 2008 contract defined the term "incidental" to mean "work in, on, and up to a perimeter of 5 feet around the structure, or to complete an item of work if its origin is within the 5 foot perimeter." Id.

Finally, like the 2006 contract, the 2008 contract included the "Order Limitations" and "Requirements (OCT 1995) -- Alternate I (APR 1984)" provisions taken from the FAR. Id. at A286–87.

### III. The 2009 Contract

After the 2008 contract expired, the Army entered another one-year contract with Certified on May 29, 2009. Id. at A295–96. The 2009 contract remained similar to the 2008 contract in some respects, but also included substantial changes. First, the general description of the 2009 contract included several references to "pavement" that did not appear in the equivalent description in the 2008 contract. Id. at A295. Specifically, the contract description stated that the 2009 contract was a "requirements-type contract for construction/repair of asphalt pavement, concrete pavement, pavement markings, and site preparation at Fort Knox, KY." Id.; see also id. at A187 (describing the 2008 contract as a "requirements-type contract for concrete placement, asphalt surface treatments, pavement markings, and site preparation at Ft. Knox, KY").

4

The 2009 contract's "Scope" clause also expanded the scope of the contractor's work, which now included furnishing:

> all labor, materials, equipment, transportation, traffic control, <u>engineering, layout</u>, and supervision for construction and repair of asphalt pavement work (<u>to include preparing subgrade to receive compacted crushed stone base</u>, new asphalt pavement, asphalt overlays, asphalt surface treatments, etc.), concrete pavement work (to include <u>preparing subgrade to receive compacted crushed stone base</u>, concrete placement for roads, airfields, test sites, walks, retaining walls, parking lots, appurtenances, etc.) and site work associated with the placement of concrete and asphalt or stand alone site work (to include <u>clear & grubbing</u>, excavation, placing compacted fill, finish grading, turf reestablishment, etc.) for completion of a total project in post areas at Fort Knox, Kentucky.

<u>Id.</u> at A322 (emphasis added to changes from the 2008 contract).

The 2009 contract also omitted the "Important Notes" section found in the other two contracts. Thus, the 2009 contract did not include a clause reserving to the government the right to have work falling within the scope of the contract performed in-house, with job order contracting, with troop labor, or by another contract where the work was incidental to other projects. <u>See id.</u> at A320–23; Def.'s Mot. at 9.

Finally, while the 2009 contract incorporated the same "Order Limitations" provision derived from the FAR as the 2006 and 2008 contracts, it included a different version of the "Requirements" provision. Thus, the version found in the 2009 contract was titled "Requirements (OCT 1995)" rather than "Requirements (OCT 1995) -- Alternate I (APR 1984)." <u>See</u> Def.'s Mot. App. at A320–21. In the version found in the 2009 contract, paragraph (c) of the provision differed in several ways from the equivalent paragraph in the version found in the 2006 and 2008 contracts. First, in the 2006 and 2008 contracts, but not the 2009 contract, paragraph (c) began with the following sentence: "The estimated quantities are not the total requirements of the Government . . . but are estimates of requirements in excess of the quantities that the [government] may itself furnish within its own capabilities." <u>See id.</u> at A174, A286–87, A320.

Further, in the 2009 contract, paragraph (c) stated only that "[e]xcept as this contract otherwise provides, the Government shall order from the Contractor all the supplies or services specified in the Schedule that are required to be purchased by the Government." <u>Id.</u> at 320. In the 2006 and 2008 contracts, by contrast, paragraph (c) also provided that: "[e]xcept as this contract otherwise provides, the Government shall order from the Contractor all of [its] requirements for supplies and services specified in the Schedule <u>that exceed the quantities that the [government] may itself furnish</u>." <u>See id.</u> at A174, A287 (emphasis added).

5

**IV.    Certified's Claims to the CO**

On September 17, 2012, Certified submitted a claim to the CO for damages under the 2006 contract. See id. at A325–26. Certified alleged that the government had "diverted substantial portions of work falling within the Work Scope to [other] contractors," and that the diverted work "was not incidental to the other work being performed by those contractors and, therefore, did not fall into the exclusion for which the Government provided in the Contract." Id. at A326. Certified estimated that "its lost profits from said work would have exceeded approximately $4,000,000." Id. In a subsequent letter, Certified reduced its estimated lost profits to $2,989,818.13. See id. at A328–29.

On May 14, 2014, Certified submitted another claim to the CO, this time seeking damages under the 2008 contract. See id. at A333–34. As with its first claim, Certified asserted that the government had diverted work falling within the scope of the 2008 contract to other contractors, and that the diverted work was not incidental to other work performed by those contractors. Id. at A334. Certified maintained that although it had tried to "determine the exact scope of work diverted from its Contract" by requesting copies of the government's other delivery orders via the Freedom of Information Act, it had been unsuccessful. Id. In the absence of this information, it estimated its lost profits under the 2008 contract at $5,811,371.90. Id.

On December 5, 2014, Certified submitted a third claim to the CO, now seeking damages under the 2009 contract. See id. at A340–41. Certified again contended that the government had diverted work falling within the scope of its contract to other contractors. Id. at A340. It estimated that its lost profits under the 2009 contract totaled $3,645,409.67. Id. at A341.

The CO issued a final decision denying Certified's first claim on June 29, 2015. See Compl. Ex. D. The CO agreed that the 2006 contract was a "requirements type contract" but determined that the work performed by the other contractors "d[id] not fall within the scope of your contract." Id. at 1–3. According to the CO, it was "clear" that Certified's contract "[was] for paving and paving associated activities." Id. at 3. Further, "[i]n specific relation to concrete, the scope include[d] those activities based on horizontal placement of concrete for roads[,] parking lots[,] and walkways[,] and any structural concrete work incidental to these paving activities," such as installing "drains, culverts, retaining walls and porches and steps and patios." Id.

By contrast, the CO determined that the work performed by the other contractors consisted of "concrete placement of standalone concrete structures or incidental concrete placement included in larger vertical construction projects associate[d] with buildings or other non-paving projects." Id. Thus, the "projects identified in [Certified's] claim f[e]ll outside any obligation of the government to utilize [its] contract for placement of associated concrete work." Id. The CO apparently never issued a decision on Certified's claims under the 2008 and 2009 contracts. See Pl.'s Resp. at 8.

6

**V.       This Action**

Certified filed its complaint in this Court on September 21, 2015. ECF No. 1. It alleged that the 2006, 2008, and 2009 contracts were requirements contracts for concrete placement, asphalt surface treatments, and pavement markings, and that the government breached the contracts by diverting work within the scope of the contracts to other contractors. Id. ¶¶ 13–14, 26, 28–29, 35, 37–38, 46. As a result, Certified claimed that it was entitled to an award of lost profits. Id. ¶¶ 26, 35, 46.

The government answered the complaint on December 21, 2015, ECF No. 8, and indicated to the Court during a status conference that it intended to file a motion for summary judgment, see Order at 1–2, ECF No. 13. After the government filed its motion for summary judgment, Certified informed the Court that it would require some discovery to effectively respond to the government's motion. See Pl.'s Notice Pursuant to Order of March 11, 2016 at 1–2, ECF No. 20. The Court then extended the deadline for Certified's response to the government's motion several times. See ECF Nos. 22, 24.

On July 5, 2016, Certified filed its response to the government's motion. ECF No. 25. In it, Certified noted that although the government had not yet produced all the documents it had requested, it believed enough evidence existed to demonstrate the existence of genuine issues of material fact and thus preclude summary judgment. See Pl.'s Resp. to Mot. for Summ. J. (Pl.'s Resp.) at 9. The government filed a reply in support of its motion on July 29, 2016, ECF No. 30, and the Court heard oral argument on the motion on October 26, 2016.

**DISCUSSION**

**I.      Jurisdiction**

Pursuant to the Tucker Act, the United States Court of Federal Claims may "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a) (2012). Subsection (a)(2) of section 1491 further grants the Court of Federal Claims "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41"—that is, the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101–09—"including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act." 28 U.S.C. § 1491(a)(2).

The CDA sets forth its own jurisdictional requirements. See M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1327–28 (Fed. Cir. 2010). In particular, it states that a contractor may bring an action de novo in federal court "within 12 months from the date of receipt of a contracting officer's decision." 41 U.S.C. § 7104(b)(3). Thus, the Federal Circuit has held that for the Court of Federal Claims to possess

jurisdiction, the contractor must have first submitted a valid claim to the contracting officer and received the contracting officer's final decision on that claim. M. Maropakis Carpentry, 609 F.3d at 1327–28; see also Dalton v. Sherwood Van Lines, Inc., 50 F.3d 1014, 1017 (Fed. Cir. 1995) ("When the [CDA] applies, it provides the exclusive mechanism for dispute resolution; [it] was not designed to serve as an alternative administrative remedy, available at the contractor's option."). Further, "[f]ailure by a contracting officer to issue a decision on a claim . . . is deemed to be a decision by the contracting officer denying the claim." 41 U.S.C. § 7103(f)(5).

Here, the government does not contest that Certified submitted valid claims to the CO regarding its allegations of breach under the 2006, 2008, and 2009 contracts, and that the CO either denied the claims or failed to respond to them. Accordingly, the Court has jurisdiction over this action under 28 U.S.C. § 1491(a)(2).

## II.     Standard for Summary Judgment

The standards for granting summary judgment are well established. Summary judgment may be granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Rules of the Court of Federal Claims (RCFC) 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the burden of establishing the absence of any genuine issue of material fact, and all significant doubts regarding factual issues must be resolved in favor of the party opposing summary judgment. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). "Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence." Crown Operations Int'l, Ltd. v. Solutia Inc., 289 F.3d 1367, 1375 (Fed. Cir. 2002), citing Anderson, 477 U.S. at 248.  The court should act with caution in granting summary judgment and may deny summary judgment "where there is reason to believe that the better course would be to proceed to a full trial." Anderson, 477 U.S. at 255.

## III.    Standards for Contract Interpretation

The interpretation of a contract begins with its language. Bell/Heery v. United States, 739 F.3d 1324, 1331 (Fed. Cir. 2014). "When interpreting the contract, the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts." NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004). If the contract's "provisions are 'clear and unambiguous, they must be given their plain and ordinary meaning.'" Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1040 (Fed. Cir. 2003) (quoting Landmark Land Co. v. Fed. Deposit Ins. Corp., 256 F.3d 1365, 1373 (Fed. Cir. 2001)); see also Sea-Land Serv., Inc. v. United States, 553 F.2d 651, 658 (Ct. Cl. 1977). Therefore, "the court may not look to

extrinsic evidence to interpret [unambiguous] provisions." TEG-Paradigm Envtl., Inc. v. United States, 465 F.3d 1329, 1338 (Fed. Cir. 2006).

If, on the other hand, the contract's language "can reasonably be interpreted in more than one way," LAI Servs. v. Gates, 573 F.3d 1306, 1314 (Fed. Cir. 2009), the court "may appropriately look to extrinsic evidence to aid in [its] interpretation of the contract." Gardiner, Kamya & Assocs., P.C. v. Jackson, 467 F.3d 1348, 1354 (Fed. Cir. 2006) (quoting Metro. Area Transit, Inc. v. Nicholson, 463 F.3d 1256, 1260 (Fed. Cir. 2006)). Such extrinsic evidence may include the contemporaneous circumstances, evidence of the parties' intent, and/or their course of performance. See Pub. Serv. Co. of Okla. v. United States, 88 Fed. Cl. 250, 258 (2009).

### IV. Whether the 2006 and 2008 Contracts Are Enforceable Requirements Contracts

#### A. Principles of Contract Interpretation With Respect to Requirements Contracts

As the Federal Circuit has observed, federal supply contracts ordinarily fall into one of three categories: "those for a definite quantity, those for an indefinite quantity[,] and those for requirements." Ace-Fed. Reporters, Inc. v. Barram, 226 F.3d 1329, 1331 (Fed. Cir. 2000) (quoting Torncello v. United States, 681 F.2d 756, 761–62 (Ct. Cl. 1982)). The key characteristic of an enforceable requirements contract is the government's agreement "to fill all its actual requirements for specified supplies or services during the contract period by purchasing from the awardee, who agrees to provide them at the agreed price." Rumsfeld v. Applied Cos., Inc., 325 F.3d 1328, 1334 (Fed. Cir. 2003) (quoting Medart, Inc. v. Austin, 967 F.2d 579, 581 (Fed. Cir. 1992)); see also Maint. Eng'rs v. United States, 749 F.2d 724, 725–26 (Fed. Cir. 1984). Thus, the touchstone right conferred on the contractor by a requirements contract is exclusivity. See Modern Sys. Tech. Corp. v. United States, 979 F.2d 200, 205 (Fed. Cir. 1992); Mason v. United States, 615 F.2d 1343, 1348 (Ct. Cl. 1980).

Because a contractor holding a requirements contract has a right of exclusive access to some portion of the government's business, the government may breach the contract if it diverts work falling within the contract's scope to another contractor. See Ace-Fed. Reporters, 226 F.3d at 1332–33; Mason, 615 F.2d at 1347. The contractor may then seek damages in the form of lost profits—a remedy that is not available to a contractor with an indefinite quantity contract. See Ace-Fed. Reporters, 226 F.3d at 1332–33.

Finally, when determining whether a particular contract constitutes an enforceable requirements contract, the court "should not be blinded by how one labels [the] contract." Id. at 1331 (citing Maint. Eng'rs v. United States, 749 F.2d at 726 n.3). Instead, the court should examine the contract to "determin[e] the respective rights conferred by [its] terms" on the parties. Mason, 615 F.2d at 1347.

9

### B. Application of Principles

In this case, the government has conceded that the 2009 contract was a valid requirements contract. See Def.'s Reply at 9–10; Oral Argument at 1:46–2:04. It argues, however, that the 2006 and 2008 contracts were not enforceable requirements contracts because they did not obligate the government to turn exclusively to Certified to fulfill its needs for work falling within the contracts' respective scopes. See Def.'s Mot. at 14–15; Def.'s Reply at 2–3. The government's argument centers on the clause in the contracts' "Important Notes" sections in which the government reserved the right to "perform the work included in this contract with in-house personnel, Job Order contracting, troop labor, or by another contract where concrete placement, asphalt surface treatment, or pavement marking is incidental to other work." Def.'s Mot. at 15–16; see also Def.'s Mot. App. at A173 (2006 contract); id. at A285 (2008 contract).

The government contends that under a plain reading of the clause, the final modifying phrase—"where concrete placement, asphalt surface treatment, or pavement marking is incidental to other work"—applies only to the term "by another contract," which immediately precedes that phrase. Def.'s Mot. at 15–16. In its view, had the parties intended that the phrase modify the full list of possible labor sources—i.e., "in-house personnel, Job Order contracting, troop labor, or by another contract"—they would have placed the modifying phrase at the beginning of the clause, or offset the list of labor sources from the modifying phrase by placing a comma between the words "contract" and "where." Oral Argument at 5:35–58, 6:56–7:29. Therefore, the government argues, the Army was free to turn to in-house personnel, job order contracting, or troop labor to supply all of its needs for work within the scope of the contract.

On the other hand, Certified urges the Court to read the modifying phrase as applying to every labor source listed in the clause. See Pl.'s Resp. at 13–14. Thus, under Certified's reading, it retained the exclusive right to perform all "concrete placement, asphalt surface treatment, or pavement marking" that was not "incidental to other work."

Neither interpretation is foreclosed by the clause's language, viewed in isolation. As noted above, however, the Court's interpretive task is not fulfilled by parsing the meaning of the clause in isolation; rather, it must consider the contract "as a whole" and interpret it "so as to harmonize and give reasonable meaning to all of its parts." See NVT Techs., Inc., 370 F.3d at 1159. Taking the contract as a whole into consideration, the Court finds Certified's reading more persuasive.

Thus, it is obvious to the Court that the parties intended to form an enforceable requirements contract: the contract describes itself as a "requirements-type" contract; it includes FAR provisions meant for inclusion only in a requirements contract; and the CO himself believed that the 2006 contract was a requirements contract. Under the government's reading, though, a single clause in the contract renders the parties' agreement illusory. The government's interpretation therefore does not "harmonize and give reasonable meaning" to all the provisions of the contract. To the contrary, it negates the multiple representations in the contracts that they were requirements contracts. Accordingly, the Court will interpret the modifying phrase "where concrete placement,

asphalt surface treatment, or pavement marking is incidental to other work" as applying to all four sources of labor listed in the clause.

So interpreted, the clause does not vitiate Certified's exclusive right to work under the contracts, but simply sets a boundary on the scope of the concrete placement, asphalt surface treatment, or pavement marking work that must go to Certified. That is, it carves out an exception that applies where such work is incidental to other work. Even with this carve-out in place, the contract meaningfully constrained the government's discretion to obtain pavement work from sources other than Certified because the government had to turn to Certified for any project for which asphalt or concrete pavement work was not incidental to another project, and which did not exceed the maximum order limitations in the contracts.

Accordingly, the Court concludes that the clause included in the 2006 and 2008 contracts' "Important Notes" sections did not render the contracts unenforceable or negate the parties' clear intent to enter requirements contracts. Thus, that clause does not provide a basis for granting summary judgment in the government's favor with respect to those two contracts.[4]

---

[4] The Court notes that both the 2006 and 2008 contracts include the FAR's "Requirements (OCT 1995) -- Alternate I (APR 1984)" provision, which states that the government "shall order from the Contractor all of that activity's requirements for supplies and services specified in the Schedule that exceed the quantities that the activity may itself furnish within its own capabilities." In Horn v. United States, 98 Fed. Cl. 500, 504–05 (2011), and Ralph Constr., Inc. v. United States, 4 Cl. Ct. 727, 731 (1984) the courts held that contracts that include this provision do not confer an exclusive right on the contractor to perform all the government's requirements, and are therefore not requirements contracts, because the clause specifies that the government would order only those services that exceeded the quantities that the government might "itself furnish within its own capabilities." Horn, 98 Fed. Cl. at 504; Ralph Constr., 4 Cl. Ct. at 732.

It is unclear to what extent the government is relying upon the FAR provision for its arguments here. See Oral Argument at 4:33–55 (counsel for the government stating that "I don't think the Court needs to reach t[he] issue" raised in Horn and Ralph Constr. because the "Important Notes" provision in this case went beyond the reservation found in the FAR provision). But in any event, in this Court's view, the reasoning in Horn and Ralph Constr. is unpersuasive. The right conferred by a requirements contract is the right to exclude entities other than the contractor from obtaining some defined portion of the government's business. See Ace-Fed. Reporters, 226 F.3d at 1332–33; see also Mason, 615 F.2d at 1347–48. Inclusion of the FAR provision (which after all only appears in contracts that are ostensibly requirements contracts) has the effect of defining the portion of the government's business to which a contractor has the exclusive right—i.e., all services within the contract's scope that the government cannot furnish with its own capabilities. In other words, where a contract "b[inds] the government to order from the

11

**V. The Scope of the Requirement**

The work descriptions found in the contracts make clear that they covered paving projects, along with subsidiary tasks necessary to complete such paving projects (as well as stand-alone site work). First, the contracts' general descriptions all relate to paving or other surface work. Thus, the general description of the 2006 contract stated that it was a "requirements-type contract for concrete placement, asphalt surface treatments and pavement markings." Def.'s Mot. App. at A127. The equivalent provision in the 2008 contract stated that it was a "requirements-type contract for concrete placement, asphalt surface treatments, pavement markings, and site preparation." Id. at A187. And the description in the 2009 contract stated that it was a "requirements-type contract for construction/repair of asphalt pavement, concrete pavement, pavement markings, and site preparation." Id. at A295.

Further, each contract's "Scope" section provided additional detail about the types of paving projects that Certified could expect. With respect to concrete work, these descriptions varied slightly from contract to contract, using different combinations of the terms "concrete pavement," "concrete placement," and "concrete services." Thus, the 2006 contract's Scope section described the work as including "concrete pavement work (to include concrete services for roads, airfields, test sites, walks, retaining walls, parking lots, appurtenances, etc.)." Id. at A177. The 2008 contract's Scope section stated that the work would include "concrete pavement work (to include concrete placement for roads, airfields, test sites, walks, retaining walls, parking lots, appurtenances, etc.). Id. at A290. And the 2009 contract's Scope section described the concrete work as "concrete pavement work (to include preparing subgrade to receive compacted crushed stone base, [and] concrete placement for roads, airfields, test sites, walks, retaining walls, parking lots, appurtenances, etc.). Id. at A322.

In addition, each contract's Scope section also set forth an identical list of representative, paving-type tasks, as follows:

- Base course restoration
- Crack repair
- Joint Repair
- Concrete headwalls
- Complete restoration
- Concrete Curb & Gutter
- Concrete Porches, Steps and Patios
- Slab Jacking
- Concrete Sidewalk
- Rapid set concrete repair
- Culverts and Drainage structures
- Repair or construction of roads
- Airfield surfaces, walkways, retaining walls, parking lots, etc.
- Concrete footings

Id. at A177, A290, A322. Further, the contract line items (CLINs) incorporated in each contract all related to paving and pavement-related work. See, e.g., id. at A131 (CLIN

---

contractor if it order[s] at all," the contract is a valid requirements contract. See John Cibinic, Jr. et al., Formation of Government Contracts 1348 (4th ed. 2011).

calling for contractor to "[c]lean and seal joints in concrete pavement in accordance with . . . the Specifications); id. at A190 (CLIN calling for contractor to place "[c]oncrete entrance pavement conforming to Standard); id. at A298 (CLIN calling for contractor to place "[c]oncrete curb & gutter conforming to standard [d]rawing . . . and in accordance with . . . the specifications). Finally, each contract incorporated by reference the "Standard Specification for Road and Bridge Construction" published by the Kentucky Department of Highways. Id. at A180, A291, A323.

Certified's textual argument for a broader construction of the contract's scope that includes structural work is unpersuasive. Despite the contracts' identification of their scope as including concrete "placement" and/or "pavement" work, Certified argues that they also encompassed projects that were primarily structural in nature, such as the construction of concrete walls, building pads, and loading docks. See Pl. Resp. at 15–16; see also Pl.'s Resp. App. at PA1979–2297 (examples of orders placed under Certified's contracts). But the use of the words "placement" and "pavement" as opposed to "construction," along with the examples of tasks set forth above, the CLINs, and the fact that the contract incorporates specifications for road and bridge but not building construction, all indicate a scope that is much narrower than the one urged by Certified.. Indeed, given the estimated cost of the contracts—ranging from $1,350,000 per contract year to approximately $9,000,000 per contract year—Certified's argument that it was given a requirements contract for all structural concrete projects at Fort Knox is implausible.

Certified also points to the "may include but not be limited to" proviso found in the "Scope" sections, contending that the contracts' lists of representative tasks were "non-exhaustive" and thus that the contracts did not specifically exclude "structural and non-pavement work." Pl.'s Resp. at 16. In the context of the Scope sections as a whole, however, the proviso is best read as providing a non-exhaustive list of tasks that fall under the rubric of either construction and repair of asphalt pavement or concrete pavement as opposed to tasks undertaken for different purposes.

Finally, Certified argues that the government "frequently order[ed] Certified to perform work of a structural nature" under its previous contracts, which it claims had the same scope as the contracts at issue. Pl.'s Mot. at 16. But it would be improper for the Court to consider such extrinsic evidence in interpreting the scope of the contract, given that the contract's plain language clearly concerns only non-structural types of concrete work. See United States v. Ford Motor Co., 463 F.3d 1267, 1278–79 (Fed. Cir. 2006) ("Course of performance evidence in most circumstances is relevant to interpretation of an instrument only if the terms of that instrument are ambiguous."); Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004) (same); McAbee Constr. Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (court "may not resort to extrinsic evidence to interpret" contract if its terms are unambiguous).

In short, the plain language of the contracts shows that each contract's scope was limited to paving and related surface projects (with the understanding that the 2006 and 2008 contracts included an additional carve-out for paving projects that were incidental to other work performed with in-house personnel, job order contracting, troop labor, or by

13

another contract). Stand-alone structural concrete projects were not within the scope of the contracts. In addition, in light of the maximum order limitations in the contracts, the government's obligation to procure the covered services through Certified is limited to orders that did not exceed $200,000 for a single item or $400,000 for a combination of items.

At this point in the case, discovery has not been completed and the record before the Court is unclear as to which of the projects Certified claims were improperly diverted fell within the scope of the contracts, as set forth above, and which did not. Because the government has not established the absence of any genuine dispute of material fact with respect to this issue, it is not entitled to summary judgment.

## CONCLUSION

For the reasons discussed above, the government's motion for summary judgment is **DENIED**.

**IT IS SO ORDERED.**

      /s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge