# In the United States Court of Federal Claims

No. 15-1049C
Filed: July 20, 2020

| | |
|---|---|
| **CERTIFIED CONSTRUCTION CO. OF KENTUCKY, LLC,** <br><br> *Plaintiff,* <br><br> v. <br><br> **THE UNITED STATES,** <br><br> *Defendant.* | **Keywords:** Contract Interpretation; Ambiguity; Law of the Case; Mandate Rule; Requirements Contract. |

*Thomas Edward Roma, Jr.*, Manion Stigger, LLP, Louisville, KY, for the Plaintiff.

*Igor Helman*, Trial Attorney, *Claudia Burke*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Ethan P. Davis*, Assistant Attorney General, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for the Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

This dispute requires the Court to apply contractual terms to determine the limits of exclusivity otherwise guaranteed in a series of requirements contracts. Plaintiff, Certified Construction Company of Kentucky, LLC ("Certified"), claims that the United States breached three requirements contracts held by Certified for concrete placement and/or placement work at the United States Army ("Army") base at Fort Knox, Kentucky. Specifically, Certified alleges that the United States diverted work to other contractors, thereby breaching its contracts and entitling Certified to lost profit damages.

The Court previously held that: "the plain language of the contracts shows that each contract's scope was limited to paving and related surface projects . . .. Stand-alone structural concrete projects were not within the scope of the contracts." (Opinion and Order Denying Def.'s Mot. for Summ. J., *Certified Constr. Co. of Ky., LLC v. United States* (*Certified I*), 129 Fed. Cl. 55, 66 (2016) (Kaplan, J.), ECF No. 34).[1] The Court denied the United States' motion for summary judgment because "the government [did] not demonstrate[] the absence of any genuine issue of material fact with respect to whether any particular projects that may have been performed by other contractors fell within this category." *Id.* at 57.

Now before the Court are the parties' cross-motions for partial summary judgment on 220 of the 367 work orders allegedly diverted to other contractors. (*See* Pl.'s Mot. for Partial

---

[1] This matter was originally assigned to Judge Elaine D. Kaplan and was transferred to the undersigned on December 3, 2019. (*See* ECF No. 79).

Summ. J. ("Pl.'s Mot."), ECF No. 58; Def.'s Cross-Mot. for Partial Summ. J. ("Def.'s Cross-Mot."), ECF No. 67). These motions became fully briefed on December 5, 2019. (*See* Pl.'s Resp. and Reply, ECF No. 73; Def.'s Reply, ECF No. 81).

At a status conference held February 4, 2020, the parties agreed that Alternative Dispute Resolution ("ADR") would be helpful to narrow the issues for trial. (Status Conference Tr. ("Tr.") 28:25–29:1, 30:15–23, 31:17–25, ECF No. 92). The Court explained that it was disinclined to revisit its earlier decision regarding the scope of the Contracts, but that it would wait to see how ADR was proceeding before issuing an opinion on the pending motions for partial summary judgment. (Tr. 26:24–28:2, 48:11–20). Thereafter, on February 18, 2020, the Court referred this matter to ADR with Senior Judge Firestone. (*See* ECF No. 87). Since then, the parties have filed status reports explaining that ADR is progressing but has been delayed by the recent pandemic.

This matter is ripe for decision. For the reasons set forth below, the Court **DENIES** Certified's Motion for Partial Summary Judgment and **GRANTS-IN-PART** and **DENIES-IN-PART** the United States' Cross-Motion for Partial Summary Judgment.[2]

### I.   Background[3]

Certified is a long-time contractor for the Army. From 1998 until 2010, Certified held several contracts to perform concrete placement, asphalt surface treatment, and pavement marking projects at the Army's base at Fort Knox, Kentucky. This action concerns three contracts awarded to Certified covering the years 2006 through 2010 (collectively, "the Contracts").

*A. The 2006 Contract*

On October 26, 2005, the Army awarded Contract No. W9124D-06-D-0001 (the "2006 Contract") to Certified, which was a "requirements-type contract for concrete placement, asphalt surface treatments and pavement markings" at Fort Knox. (Def.'s Mot., ECF No. 67, App. ("DA") at 307–453). The contract's initial term was to run until October 31, 2006, but the United States exercised an option to extend the term until April 30, 2008. (Compl., ECF No. 1, at ¶¶ 5–6; Answer, ECF No. 8, at ¶¶ 5–6). The "Scope" section described the contractor's work as follows:

> The contractor shall furnish all labor, materials, equipment, transportation, traffic control and supervision for construction and repair of asphalt pavement work (to include new asphalt pavement, asphalt overlays, asphalt surface treatments, etc.) and concrete pavement work (to include concrete services for roads, airfields, test sites, walks, retaining walls, parking lots, appurtenances, etc.) in family housing and post areas at Fort Knox, Kentucky.

---

[2] Due to the large number of work orders subject to the parties' motions, the Court will provide rulings on the specific work orders in an attachment to this Opinion.

[3] The Court previously detailed the facts of this case in the October 31, 2016 Opinion and Order denying the Government's motion for summary judgment, (ECF No. 34).

2

> Also included is the placement of traffic control markings on or along existing and new pavements.

(DA388). The same section of the contract also noted that "[t]he contract will be a requirements-type contract to be ordered on individual delivery orders," and that the services ordered might "include but [are] not be limited to" the following:

```
ASPHALT
    - Base course restoration          - Excavation
    - Crack repair                     - Cold milling
    - Asphalt overlay                  - Repair or construction of streets,
    - Complete restoration               range roads, airfield surfaces,
    -Rubberized Coal Tar                 parking lots, etc
    - Thermoplastic Coal Tar           - Sand Asphalt Surface
    - Emulsion Slurry                  - Pavement Marking

CONCRETE
    - Base course restoration          - Concrete Sidewalk
    - Crack repair                     - Rapid set concrete repair
    - Joint Repair                     - Culverts and Drainage structures
    - Concrete headwalls               - Repair or construction of roads
    - Complete restoration             - Airfield surfaces, walkways,
    - Concrete Curb & Gutter             retaining walls, parking lots,
    - Concrete Porches, Steps            etc.
      and Patios                       - Concrete footings
    - Slab Jacking
```

(*Id.*).

Several other provisions further delineated the contract's scope. For example, a provision in the contract's "Important Notes" section provided that the government "reserve[d] the right to perform the work included in this contract with in-house personnel, Job Order contracting,[4] troop labor, or by another contract where concrete placement, asphalt surface treatment, or pavement marking is incidental to other work." (DA353).

The contract also incorporated two provisions taken from the FAR. The first, titled "Order Limitations," incorporated FAR 52.216-19 and provided that the contractor was "not obligated to honor" any order of less than $2,000 for a single item; any order of more than $200,000 for any single item; any order of more than $400,000 for a combination of items; or "[a] series of orders from the same ordering office within seven days that together call for quantities exceeding the limitation[s for a single item or combination of items]." (DA357). In addition, the provision stated,"[i]f this is a requirements contract . . . the Government is not required to order a part of any one requirement from the Contractor if that requirement exceeds the maximum-order limitations [set forth] above." (*Id.*).

---

[4] According to the Government, "Job Order Contracting (JOC) involves cont[r]acts for the small scale, non-programmed military construction projects that are a regular feature of garrison maintenance and upgrades," and "[t]he scope of the JOC includes paving activities associated with construction projects." (Def.'s Resp. and Cross-Mot., ECF No. 67 at 6 n.3).

The second incorporated FAR provision, FAR 52.216-21, entitled "Requirements. (OCT 1995) -- Alternate I (APR 1984)," stated: "[t]he estimated quantities are not the total requirements of the Government . . . but are estimates of requirements in excess of the quantities that the [government] may itself furnish within its own capabilities." (*Id.*). The provision continued, "[e]xcept as this contract otherwise provides, the Government shall order from the Contractor all of [its] requirements for supplies and services specified in the [contract] that exceed the quantities that the [government] may itself furnish within its own capabilities." (*Id.*). The provision also stated that "[t]he Government is not required to purchase from the Contractor requirements in excess of any limit on total orders under this contract." (*Id.*).

B. The 2008 Contract

After exercising options to extend the 2006 Contract through April 30, 2008, (*see* Compl. ¶¶ 5–6; Answer ¶¶ 5–6), the Army entered into another one-year contract with Certified on May 15, 2008 (the "2008 Contract"). (*See* DA457–691). The 2008 Contract was identical to the 2006 Contract in many material respects but included some changes. For example, in addition to "concrete placement, asphalt surface treatments, [and] pavement markings," the 2008 Contract also covered "site preparation" work. (*See* DA458, 602). The contract's "Scope" section was also modified to provide:

> The contractor shall furnish all labor, materials, equipment, transportation, traffic control and supervision for construction and repair of asphalt pavement work (to include new asphalt pavement, asphalt overlays, asphalt surface treatments, etc.), concrete pavement work (to include concrete *placement* for roads, airfields, test sites, walks, retaining walls, parking lots, appurtenances, etc.) *and site work associated with the placement of concrete and asphalt or stand alone site work (to include excavation, placing fill, finish grading, turf re-establishment, etc.) for completion of a total project* in post areas at Fort Knox, Kentucky. Also included is the placement of traffic control markings on or along existing and new pavements *and incidentals as listed below.*

(DA601–02) (emphasis added to changes made from the 2006 Contract). Thus, in addition to asphalt and concrete work, the 2008 Contract also included services for:

```
SITE WORK (Earth or Crushed Stone)

    - Excavation              - Topsoil placement
    - Compacted Fill          - Turf establishment
    - Finish Grading

INCIDENTALS

    - Guardrail               - Tree removal
    - Chain link fence        - Electrical conduit
    - Concrete barriers       - Storm sewer cleaning
    - Erosion control         - Fire hydrant relocation
```

(*Id.*).

4

As with the 2006 Contract, the 2008 Contract included an "Important Notes" section with a clause stating that the United States "reserve[d] the right to perform the work included in this contract with in-house personnel, Job Order contracting, troop labor, or by another contract where concrete placement, asphalt surface treatment, or pavement marking is incidental to other work." (DA557). Unlike the 2006 Contract, which did not define the term "incidental," the 2008 Contract defined the term as: "work in, on, and up to a perimeter of 5 feet around the structure, or to complete an item of work if its origin is within the 5 foot perimeter." (*Id.*).

Further, like the 2006 Contract, the 2008 Contract included the "Order Limitations" and "Requirements (OCT 1995) -- Alternate I (APR 1984)" provisions taken from the FAR. (DA561–62). However, the Order Limitations provision in the 2008 Contract differed slightly from the 2006 Contract. Specifically, subsection (b)(3) of this provision provided that the Contractor was not obligated to honor, nor the United States obligated to award "[a] series of orders from the same ordering office within three days that together call for quantities exceeding the limitations [above]." (DA561). The provision in 2006 Contract provided a seven-day time period in which delivery orders from the same office would be considered aggregated. (DA357)

On May 21, 2008, shortly after the 2008 Contract was executed, the United States issued Modification No. P0001, which added Contract Line Item Number ("CLIN") 0134 to the 2008 Contract. (*See* DA692–95). Newly added CLIN 0134 provided a line item for Certified to "construct a variety of standard concrete targets at Rodgers Hollow to include forming and placing 5,000 psi concrete, reinforcing steel and required testing." (*Id.*).

Rodgers Hollow is a remote military training facility, separated from the rest of Fort Knox, utilized solely by Joint Special Operations Command ("JSOC") via an installation support agreement. (DA906) (Declaration of Clayton R. Callihan). JSOC uses Rodgers Hollow for "training and research, development, testing and evaluation ("RDT&E")." (*Id.*). When JSOC utilizes "some Fort Knox services, such as Department of Public Works (DPW) services like utilities and contract services, . . . it is done on a reimbursable basis via support agreement." (*Id.*). "A primary focus of the RDT&E and training [conducted] at Rodgers Hollow involves heavy/hard concrete targets. Dozens of targets are fabricated each year at Rodgers Hollow. These targets are made as reinforced concrete panels, walls, doors, or roof panels." (DA907). Targets are made to specifications provided by the staff at the facility. (*Id.*). "The targets are typically either 'cast-in-place' [("CIP")] (in a fixed position on the range and cannot be moved/relocated) or 'tilt-up' (fabricated in [the Rodgers Hollow] tilt-up yard and can be relocated after construction to a laydown storage yard or down range to be set up for training[)]." (*Id.*). "All the targets are consumable and are destroyed through the testing/training process or stored for future testing/training events." (*Id.*). "[S]ince 2003 there has been no road-paving, asphalt, or sidewalk projects of any kind at Rodgers Hollow." (*Id.*). "The concrete panels and targets cast at Rodgers Hollow are not used to carry vehicle or pedestrian traffic." (DA908).

C. The 2009 Contract

After the 2008 Contract expired, the Army entered another one-year contract with Certified on May 29, 2009 (the "2009 Contract"). (*See* DA698–863). The 2009 Contract, though similar to the 2008 Contract in some respects, also included substantial changes. First, the general description of the 2009 Contract included several references to "pavement" that did not appear in the equivalent description in the 2008 Contract. (*See, e.g.*, DA698). In particular, the 2009 Contract description stated that it was a "requirements-type contract for construction/repair

of asphalt pavement, concrete pavement, pavement markings, and site preparation at Fort Knox, KY." (*Id.*). Additionally, the 2009 Contract expanded the scope of the contractor's work to include:

> [A]ll labor, materials, equipment, transportation, traffic control, *engineering, layout*, and supervision for construction and repair of asphalt pavement work (*to include preparing subgrade to receive compacted crushed stone base*, new asphalt pavement, asphalt overlays, asphalt surface treatments, etc.), concrete pavement work (to include *preparing subgrade to receive compacted crushed stone base*, concrete placement for roads, airfields, test sites, walks, retaining walls, parking lots, appurtenances, etc.) and site work associated with the placement of concrete and asphalt or stand alone site work (to include *clear & grubbing*, excavation, placing compacted fill, finish grading, turf reestablishment, etc.) for completion of a total project in post areas at Fort Knox, Kentucky.

(DA701) (emphasis added to changes from the 2008 Contract).

The 2009 Contract also omitted the "Important Notes" section found in the 2006 and 2008 contracts. Thus, the 2009 Contract did not include a clause reserving to the United States a right to have work falling within the scope of the contract performed in-house, with job order contracting, with troop labor, or by another contract where the work was incidental to other projects.

Moreover, while the 2009 Contract incorporated the same FAR "Order Limitations" provision as the 2008 Contract, it included a different version of the "Requirements" FAR provision. The version found in the 2009 Contract was titled "Requirements (OCT 1995)" rather than "Requirements (OCT 1995) -- Alternate I (APR 1984)." (*See* DA727). In the version found in the 2009 Contract, paragraph (c) of the provision differed from the corresponding paragraphs in the 2006 and 2008 Contracts. (*Compare* DA727–28 *with* DA357–58 *and* DA561–62). Specifically, in the 2006 and 2008 Contracts, but not the 2009 Contract, paragraph (c) of the "Requirements (OCT 1995) -- Alternate I (APR 1984)" provision began with the following sentence: "The estimated quantities are not the total requirements of the Government . . . but are estimates of requirements in excess of the quantities that the [government] may itself furnish within its own capabilities." (*See* DA357; DA561–62). In the 2009 Contract, however, paragraph (c) stated only that "[e]xcept as this contract otherwise provides, the Government shall order from the Contractor all the supplies or services specified in the Schedule that are required to be purchased by the Government." (*See* DA727). Thus, the 2009 Contract did not have a provision allowing the United States to furnish part, or all, of the requirements itself.

Finally, unlike the 2008 Contract, which was modified to add a CLIN for constructing "concrete targets" at Rodgers Hollow, the 2009 Contract contained no provision for constructing targets at Rodgers Hollow.

## II.   Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A "genuine dispute" exists where a reasonable factfinder "could return a verdict for the nonmoving

6

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those which might significantly alter the outcome of the case; factual disputes which are not outcome-determinative will not preclude summary judgment. *Id.* The moving party bears the initial burden of proof, but this burden may be discharged by showing the absence of evidence supporting the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party makes such a showing, the burden shifts to the non-moving party to present such evidence. (*Id.* at 324). "A nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law. *Dairyland Power Co-op v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Celotex Corp.*, 477 U.S. at 323).

In determining whether summary judgment is appropriate, the court should not weigh the credibility of the evidence, but simply "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. When both parties move for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other." *Id.* "To the extent there is a genuine issue of material fact, both motions must be denied." *Marriott Int'l Resorts, L.P. v. United States*, 586 F.3d 962, 969 (Fed. Cir. 2009).

### III. Discussion

Certified now seeks to "revisit" the Court's prior conclusion that the scope of the contracts was limited to paving and related surface projects, but did not include stand-alone structural work. (*See* Pl.'s Mot. at 8). Specifically, Certified argues that the scope of the contracts at issue should be determined by the Contract Line Item Numbers contained in each respective contract, and any work covered by a CLIN in the 2006, 2008, or 2009 Contracts should have been awarded to Certified. (Pl.'s Mot. at 9–10; Pl.'s Resp. and Reply at 5–7). Certified also argues that the term "concrete pavement" is ambiguous and should be interpreted according to the parties' course of performance. (Pl.'s Mot. at 11–12; Pl.'s Resp. and Reply at 10–11). Finally, Certified seeks summary judgment on work orders for concrete targets at Rodgers Hollow allegedly diverted from the 2008 Contract. (Pl.'s Mot. at 12–13; Pl.'s Resp. and Reply at 11–12).

The United States argues that reinterpretation of the scope of the Contracts is foreclosed by the "law of the case" doctrine and maintains that Certified has not shown that any "special circumstances" exist that would warrant reconsideration of the Court's earlier ruling. (Def.'s Cross-Mot. at 11–15). Additionally, the United States seeks summary judgment on 220 of the 367 work orders identified by Certified as having been improperly diverted to other contractors, alleging that these work orders fall outside the scope of Certified's contracts for one or more reasons. (*Id.* at 20–32).

As explained below, the Court agrees that it would be improper to reconsider its earlier ruling as to the scope of the Contracts at issue. Moreover, while some work orders identified by the parties are appropriate for summary judgment, others are not. The Court will address each issue in turn.

A. *Scope of the Contracts*

Earlier in this litigation, the Court considered the scope of the contracts at issue and held:

> [T]he plain language of the contracts shows that each contract's scope was limited to paving and related surface projects (with the understanding that the 2006 and 2008 contracts included an additional carve-out for paving projects that were incidental to other work performed with in-house personnel, job order contracting, troop labor, or by another contract). Stand-alone structural concrete projects were not within the scope of the contracts.

*Certified I*, 129 Fed. Cl. at 66. The Court specifically rejected Certified's argument that the contracts were requirements contracts for all structural concrete projects at Fort Knox and declined to consider extrinsic evidence in interpreting the scope of the contracts, reasoning "the contract's plain language clearly concerns only non-structural types of concrete work." *Id.* However, the Court denied the United States' Motion for Summary Judgment because discovery had not yet been completed and the record was unclear as to which of the projects alleged to have been improperly diverted fell within the scope of the contracts. *Id.*

Now that discovery is complete, Certified asks the Court to revisit its earlier holding that the scope of the contracts was limited to concrete pavement work,[5] and raises two arguments in support of its position. (*See* Pl.'s Mot. at 8). First, Certified argues the scope of the contracts should be defined by the CLINs because the Contracts refer to a "schedule" as specifying the supplies and services to be ordered from Certified, and this "schedule" contains the CLINs and unit price bid by Certified for each supply or service. (*Id.* at 10). Certified further contends that the CLINs define the scope of the Contracts because "the Contracting Officer testified that he looked to the CLINs to determine whether a task order fell within the scope of Certified's contract in existence at the time." (*Id.*). Second, Certified argues that the term "concrete pavement" is ambiguous because the contracts do not define the term and the "Scope" section of the contracts list examples of work, such as "concrete porches, steps and patios," that may be considered structural. (*Id.* at 11–12). According to Certified, the Court should look to the parties' course of performance to resolve that ambiguity. (*Id.* at 11; Pl.'s Reply at 10–11). These arguments, however, fail to persuade the Court that reconsideration of its earlier ruling is warranted.

As an initial matter, despite requesting that the Court "revisit" its conclusion regarding the scope of the Contracts, Certified does not cite to or mention the legal standards governing reconsideration in its Motion for Partial Summary Judgment. (*See generally*, Pl.'s Mot.). Certified argues that reconsideration of a prior ruling is not foreclosed by the "mandate rule," (*See* Pl.'s Reply at 5), but that doctrine is inapplicable here. The mandate rule "dictates that 'an inferior court has no power or authority to deviate from the mandate issued by an appellate court.'" *Banks v. United States*, 741 F.3d 1268, 1276 (Fed. Cir. 2014) (citation omitted). Here, however, there has been no appellate review of the Court's October 31, 2016 Opinion that would implicate the mandate rule.

---

[5] Certified concedes that "the contract scopes also included asphalt pavement work and placement of traffic control markings," but explains that "none of the work which Certified claims to have been diverted falls within those categories." (Pl.'s Mot. at 8 n.13).

Certified's arguments are better analyzed under the broader "law of the case" doctrine, which provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983), *decision supplemented*, 466 U.S. 144 (1984); *Banks*, 741 F.3d at 1276. "The law of the case does not involve preclusion after final judgment, but rather it regulates judicial affairs before final judgment." *Mendenhall v. Barber-Greene Co.*, 26 F.3d 1573, 1582 (Fed. Cir. 1994), *as corrected on reh'g* (Sept. 14, 1994) (citing 18 Charles A. Wright, *et al., Federal Practice and Procedure* § 4478 (1981)). The doctrine serves "[t]o preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Arizona*, 460 U.S. at 619. While there are a variety of "special circumstances" under which federal courts will reconsider a previously-determined law of the case, such as changes in applicable authority or "to avoid clear error or to prevent a manifest injustice," *Mendenhall*, 26 F.3d at 1582, Certified has not alleged that any such circumstances exist here.

Certified's principal argument in favor of reconsideration is that during discovery, the United States' contracting officer testified that he looked to the CLINs in Certified's Contracts to determine whether a work order should have been awarded to Certified. (*See* Pl.'s Mot. at 8, 10–12; Pl.'s Reply at 5–7). This argument, however, does not demonstrate clear error or manifest injustice with respect to the Court's earlier holding. It is well established that contract interpretation is a question of law. *See Hunt Const. Grp., Inc. v. United States*, 281 F.3d 1369, 1372 (Fed. Cir. 2002); *see also Stobie Creek Investments, LLC v. United States*, 608 F.3d 1366, 1383–84 (Fed. Cir. 2010) (holding it was not an abuse of discretion to exclude expert testimony on a question of law). As the Court noted in its earlier decision, contract interpretation "begins with its language" and if the contract's "provisions are 'clear and unambiguous, they must be given their plain and ordinary meaning.'" *Certified I*, 129 Fed. Cl. at 62 (quoting *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003)). The Court also explained that "the court may not look to extrinsic evidence to interpret [unambiguous] provisions." *Id.* (quoting *TEG-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006)). Ultimately, the Court determined that it would be improper to consider extrinsic evidence in interpreting the scope of the contracts at issue "given that the contract's plain language clearly concerns only non-structural types of concrete work." *Id.* Now, Certified would have the Court disregard its earlier holding, find that the contracts are ambiguous as to their scope, and rely on the testimony of a lay witness to resolve a question of law. This is precisely the behavior that the "law of the case" doctrine serves to preclude. *See Arizona*, 460 U.S. at 619. While Certified may disagree with the Court's interpretation of the scope of the Contracts, it has not identified any change in applicable law, clear error, or manifest injustice that would necessitate reconsideration of this prior holding. *See Mendenhall*, 26 F.3d at 1582.

Moreover, the Court is not persuaded that its earlier ruling was erroneous simply because the Contracts provide a "schedule" of supplies and services to be ordered from Certified and lists the CLINs in this "schedule." The Court considered the CLINs in determining the scope of the Contracts and concluded that they "all related to paving and pavement-related work." *Certified I*, 129 Fed. Cl. at 65–66, *see also id.* at 66 ("the use of the words 'placement' and pavement' as opposed to 'construction,' along with the examples of tasks set forth above, the CLINs, and the fact that the contract incorporates specifications for road and bridge but not building construction

9

all indicate a scope that is much narrower than the one urged by Certified."). Thus, the Court has already rejected Certified's arguments in this regard and will not entertain Certified's invitation to relitigate this point.

Likewise, Certified's perceived ambiguity regarding the term "concrete pavement" does not necessitate reconsideration of the Court's prior holding. Certified contends that "concrete pavement" is ambiguous because the Contracts do not define the term and contain examples of work, such as "concrete footings" and "concrete porches, steps and patios," that Certified maintains are structural in nature. (*See* Pl.'s Mot. at 8, 11–12; Pl.'s Resp. and Reply at 10–11). Certified argues that this ambiguity should be resolved by looking to the "course of performance by the parties or to the interpretation applied to previous contracts." (Pl.'s Mot. at 11–12).

As explained above, however, the Court determined that it would be improper to consider extrinsic evidence in interpreting the scope of the contracts at issue "given that the contract's plain language clearly concerns only non-structural types of concrete work." *Certified I*, 129 Fed. Cl. at 66. The Court also expressly rejected "Certified's textual argument for a broader construction of the contract[s'] scope that includes structural work," explaining:

> Despite the contracts' identification of their scope as including concrete "placement" and/or "pavement" work, Certified argues that they also encompassed projects that were primarily structural in nature, such as the construction of concrete walls, building pads, and loading docks. But the use of the words "placement" and "pavement" as opposed to "construction," along with the examples of tasks [set forth in the Contracts], the CLINs, and the fact that the contract incorporates specifications for road and bridge but not building construction, all indicate a scope that is much narrower than the one urged by Certified. Indeed, given that the estimated cost of the contracts . . . Certified's argument that it was given a requirements contract for all structural concrete projects at Fort Knox is implausible.

*Id.* In addition, with respect to the "non-exhaustive list of tasks" provided in the Contracts' Scope sections, the Court explained that these tasks "fall under the rubric of either construction and repair of asphalt pavement or concrete pavement as opposed to tasks undertaken for different purposes." *Id.*

Thus, the Court has already addressed Certified's arguments in this regard and rejected them. The tasks identified by Certified as being structural in nature, namely "concrete footings" and "concrete porches, steps and patios," fall within the general ambit of "paving and related surface projects." As such, the Certified has failed to convince the Court that there is any reason to "revisit" its earlier conclusion regarding the scope of the contracts. The Court will not permit Certified to relitigate a matter it already had a full and fair opportunity to contest.

B. *Work Orders Allegedly Diverted From Certified*

Although the general scope of the Contracts "limited to paving and related surface projects," several other provisions further narrowed the class of work orders that could be awarded to Certified under its Contracts. In addition to excluding stand-alone structural concrete projects, "the 2006 and 2008 contracts included a further carve-out for paving projects that were incidental to other work performed with in-house personnel, job order contracting, troop labor, or

10

by another contract." *Certified I*, 129 Fed. Cl. at 66; *see also id.* at 64 ("[T]he Court will interpret the modifying phrase 'where concrete placement, asphalt surface treatment, or pavement marking is incidental to other work' as applying to all four sources of labor listed in the clause."). Furthermore, "in light of the maximum order limitations in the contracts, the government's obligation to procure the covered services through Certified is limited to orders that did not exceed $200,000 for a single item or $400,000 for a combination of items." *Id.* at 66. Finally, unlike the 2008 and 2009 Contracts, the 2006 Contract did not include within its scope "site work associated with the placement of concrete . . . or stand-alone site work." (*compare* DA388, *with* DA601–02 *and* DA701).

Now that discovery is complete, Certified has identified 367 work orders that it believes were improperly diverted to other contractors. The Army issued these work orders under contracts with Lusk Mechanical Contractors ("Lusk"), Commonwealth Technologies, LLC ("Commonwealth"), Lakeshore Engineering Services ("Lakeshore"), K. Hayes Ltd, All Cities Enterprises ("All Cities"), and the Ginn Group ("Ginn"). (*See* DA886–904). The contracts with Lusk, Commonwealth, Lakeshore, and All Cities are job order contracts (JOCs). (DPFUF at 9, ECF No. 19).

Certified seeks summary judgment on 18 work orders for the construction of "concrete targets" at Rodgers Hollow that it claims were improperly diverted under the 2008 Contract. (Pl.'s Mot. at 12–13). The United States, on the other hand, seeks summary judgment on 220 work orders,[6] including the work orders for constructing concrete targets at Rodgers Hollow, that it claims fall into one or more of the following categories that were excluded from Certified's Contracts: (1) structural concrete work; (2) concrete or asphalt work that is incidental to other work performed under the contracts; (3) work that exceeded order limitations; (4) work constructing targets at Rodgers Hollow prior to and after the modification to the 2008 Contract; (5) delivery orders for stand-alone site work during the 2006 contract term; (6) certain Ginn delivery orders for which Certified Construction has not provided sufficient information to determine the nature of their tasks or duplicate orders; and (7) delivery orders that were canceled or where Certified Construction acquiesced in the work being done by other contractors. (Def.'s Cross-Mot. at 3, 21). The Court agrees with the United States that most of the work orders it identified fall outside the scope of Certified's Contracts.

1. Structural Concrete Work

The United States seeks summary judgment on 109 work orders that it claims were for structural concrete projects. (*See* Def.'s Cross-Mot. at 21–22). In response, Certified notes that "[n]one of the contracts contain a definition of 'structural' nor is that term mentioned in the scope provisions of the contracts," and argues that summary judgment is inappropriate as to the work orders identified by the United States in this category because "no structure was being constructed or renovated under the delivery order." (Pl.'s Resp. and Reply at 8–9, 13). The Court previously determined that "[t]he work descriptions found in the contracts make clear that they covered paving projects, along with subsidiary tasks necessary to complete such paving projects." *Certified I*, 129 Fed. Cl. at 65. The Court was explicit that "the plain language of the

---

[6] Certified concedes that eight of these work orders fell outside the scope of its Contracts. (*See* Pl.'s Resp. to DPFUF, 13, 31, 51, 56, 57, 64, 66, 67, ECF No. 74). As such, summary judgment in favor of the United States is appropriate as to these work orders.

11

contracts shows that each contract's scope was limited to paving and related surface projects . . . . [S]tructural concrete projects were not within the scope of the contracts." *Id.* at 66. Thus, Certified's quibbling with the meaning of "structural" is meritless.

Similarly, Certified's conclusory denials that "no structure was being constructed or renovated under the delivery order" are insufficient to demonstrate an evidentiary conflict in the record. (*See* Pl.'s Resp. and Reply at 13). For example, referencing a work order titled "Construct MWR Bingo Hall," which required the contractor to construct a 300-person, 4,500 sq. ft. "pre-engineered steel building," Certified ignores the structural nature of this work and contends that should have been awarded "the site work, foundations and concrete slab." (Pl.'s Resp. to DPFUF at 5–6). Construction of a "pre-engineered steel building" is not a paving or related surface project and Certified's contention that it should have been awarded a portion of this work is foreclosed by the clause in the 2006 and 2008 Contracts stating: "The Government reserves the right to perform the work included in this contract with in-house personnel, Job Order contracting, troop labor, or by another contract where concrete placement, asphalt surface treatment, or pavement marking is incidental to other work." (DA 353, 557). Certified makes similar arguments regarding the other work orders in this category that are equally unpersuasive. As such, Certified has failed to establish a genuine dispute of material fact with regard to these work orders as identified in the spreadsheet appended hereto.

2. Paving Projects Incidental to Other Work

The 2006 and 2008 Contracts, but not the 2009 Contract, included "Important Note 7," which provided a carve-out "for paving projects that were incidental to other work performed with in-house personnel, job order contracting, troop labor, or by another contract." *Certified I*, 129 Fed. Cl. at 66; *see also id.* at 64 ("the Court will interpret the modifying phrase 'where concrete placement, asphalt surface treatment, or pavement marking is incidental to other work' as applying to all four sources of labor listed in the clause."). Unlike the 2006 Contract, which did not define "incidental," the 2008 Contract defined the term as "work in, on, and up to a perimeter of 5 feet around the structure, or to complete an item of work if its origin is within the 5 foot perimeter." (DA557).

The United States seeks summary judgment on 99 work orders that it claims fall within this carve-out. The United States asserts that the term "incidental" is ambiguous as to the 2006 Contract and submits that the Court should look to the definition provided in the 2008 Contract to ascertain the parties' intent. (Def.'s Cross-Mot. at 23 n.7). Certified does not address the United States' ambiguity argument but contends that summary judgment is inappropriate for at least the work orders diverted from the 2009 Contract because that Contract did not include the carve-out for "incidental work." (*See* Pl.'s Reply at 13).

While it is true that the term "incidental" is not defined in the 2006 Contract, this omission does not render the term ambiguous. Interpretation of a contract begins with its language. *See Coast Fed. Bank*, 323 F.3d at 1040. "When interpreting the contract, the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts." *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (citation omitted). When a contract provision is disputed, the Court must "first determine whether the provision is unambiguous, or if it is susceptible to more than one reasonable interpretation." *Premier Office Complex of Parma, LLC v. United States*, 916 F.3d 1006, 1011 (Fed. Cir. 2019). "Ambiguity exists when contract language can reasonably be interpreted in

more than one way." *LAI Servs., Inc. v. Gates*, 573 F.3d 1306, 1314 (Fed. Cir. 2009). "When the contract's language is unambiguous it must be given its "plain and ordinary" meaning." *TEG-Paradigm Envtl.*, 465 F.3d at 1338.

Here, the term "incidental" is not susceptible to more than one reasonable interpretation. The provision in which this term is found states: "The Government reserves the right to perform the work included in this contract with in-house personnel, Job Order contracting, troop labor, or by another contract where concrete placement, asphalt surface treatment, or pavement marking is incidental to other work." (DA353). As explained in detail above, the "work included in this contract" is concrete and asphalt pavement work. (DA 358). Read in the context of the Contract as a whole, the term "incidental" is being used in the ordinary sense to mean "subsidiary" or "ancillary." Thus, if a project was not predominantly for "concrete placement, asphalt surface treatment, or pavement marking," but required such work as a subsidiary or ancillary task to complete the project, Certified was not entitled to perform that work under the 2006 Contract. Although Certified fails to address the United States' ambiguity argument, its responses to Defendant's Proposed Findings of Uncontroverted Fact indicates that it interprets the term in this way.

For example, with regard to W9124D-08-D-0046-LAKESHORE, Delivery Order No. 0025, titled "Install Smoke Shelters," which required the contractor to install three smoking shelters, two on existing concrete slabs and the third on an expanded "concrete pad around [an] existing slab," the United States contends this work was primarily structural and that any concrete and asphalt work was incidental to non-pavement work. (DPFUF at 58). Certified, on the other hand, argues "since *the bulk of the work* required under this delivery order is the placement of horizontal concrete, this work should have been performed [by Certified] under the 2008 contract. *Any structural work was simply incidental to the concrete paving work*. (Pl.'s Resp. to DPFUF at 48 (emphasis added)). While Certified is incorrect that the "bulk of the work" required under this delivery order is placement of concrete, this response shows that Certified interprets the term "incidental" according to its plain and ordinary meaning.

Thus, there is no ambiguity as to the term "incidental" in the 2006 Contract. While the 2008 Contract defined the term in a narrower sense, the lack of a definition in the 2006 Contract does not render the term ambiguous. The Court will not "convert an agreement's utter silence on an issue into contractual ambiguity." *Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1354 (Fed. Cir. 2006) (quoting *New Jersey v. New York*, 523 U.S. 767, 783 n.6 (1998)). Moreover, even if the Court were to find that the term "incidental" was ambiguous as to the 2006 Contract, it would be improper to rely on a separate, subsequent contract to interpret this term. It is well established that "the parties' *contemporaneous* construction of an agreement, before it has become the subject of a dispute, is entitled to great weight in its interpretation," *Blinderman Const. Co. v. United States*, 695 F.2d 552, 558 (Fed. Cir. 1982) (emphasis added), but the Court is unaware of any authority that supports the United States' contention that a subsequent agreement can be used to interpret an earlier, separate agreement.

In sum, the Court finds that the term "incidental" in the 2006 Contract is unambiguous. The carve-out found in "Important Note 7" provided that Certified was not entitled to perform concrete placement, asphalt surface treatment, or pavement marking where this work was incidental— i.e., subsidiary—to non-paving projects being performed through other sources. The 2008 Contract narrowed this provision by defining "incidental" as "work in, on, and up to a

perimeter of 5 feet around the structure, or to complete an item of work if its origin is within the 5 foot perimeter." (DA557).

Some of the work orders identified by the United States fall within the "Important Note 7" carve-out and are therefore appropriate for summary judgment. However, the United States also identified several work orders that were issued during the effective period of the 2009 Contract, which did not contain the carve-out described above. Consequently, the United States is not entitled to summary judgment on those work orders.

3. Order Limitations

Under the terms of the Contracts, the United States was not obligated to order, "[a]ny order for a single item in excess of $200,000," "[a]ny order for a combination of items in excess of $400,000," or "[a] series of orders from the same ordering office within three days [or seven days in the case of the 2006 Contract] that together call for quantities exceeding the limitation[s] [above]." (DA561). In addition, the Contracts provided that "the Government is not obligated to purchase" services covered by the contracts "in an amount of less than $2,000.00." (*Id.*). Finally, this provision stated, "the Government is not required to order a part of any one requirement from the Contractor if that requirement exceeds the maximum-order limitations [set forth] above." (*Id.*).

The United States seeks summary judgment on 46 work orders that it claims exceed or fall below these thresholds. (Def.'s Mot. at 24–26). In response, Certified contends that the Order Limitations do not apply to the entire delivery order, but rather only to the value of work which Certified claims was improperly diverted. (Pl.'s Reply at 13). For example, on W9124D-08-D-0045-LUSK Delivery Order No. 0222 — "Renovate Building 298" —the delivery order shows a final amount of $5,186,303.10, but Certified lists the amount of diverted work as $320,716.00. (*See* Pl.'s Resp. to DPFUF at 22–23). According to Certified, because the amount of work it claims was improperly diverted falls within the Order Limitations thresholds, it was not excluded by the Contracts.

The United States' reading of the order limitations provisions is more persuasive. The plain language of the order limitations provisions states that they apply to "any order" and sets one threshold for "a single item" and a different threshold for "a combination of items." (*See* DA357). This, along with the inclusion of the order aggregation clause, strongly indicates that the order limitations apply to the complete order, rather than by line item. Certified's interpretation would transform a requirements-type contract for paving and related surface projects into a requirements contract for **all** asphalt, concrete, and site work at Fort Knox. The Court previously rejected Certified's argument in this regard, *Certified I*, 129 Fed. Cl. at 66, and will not entertain Certified's invitation to relitigate this point in favor of a broader interpretation.

Accordingly, the Court agrees with the United States that the order limitations provisions apply to the delivery order as a whole, rather than by line item. Under the order limitations provisions, Certified was only entitled to a delivery order if that order: (1) was for a single item and did not exceed $200,000; or (2) was for a combination of items and did not exceed $400,000. Moreover, Certified was not entitled to a delivery order if that order was part of a series of delivery orders issued from the same ordering office within three days (or seven days in the case of the 2006 Contract) that together exceeded the maximum thresholds for either a single item or a combination of items. Finally, Certified was not entitled to any order less than $2,000.

14

However, there exists a genuine dispute of material fact as to Certified's pricing as it relates to the Order Limitations provisions. The United States looks to the price bid by the JOC for the entire scope of work covered by a particular work order to determine whether it exceeded the maximum order limitations. Certified was required to price its work in accordance with the CLINs in its Contracts. Thus, the value of work required under a specific work order would vary depending on whether it was subject to the JOC contractor's pricing or Certified's fixed-price pricing. As it is unclear from the record which pricing method should be applied to the Order Limitations provisions, the United States is not entitled to summary judgment on the work orders it claims fall outside the order limitations set forth in Certified's contracts.

    4.  Concrete Targets at Rodgers Hollow

Shortly after the 2008 Contract was executed, the United States issued Modification No. P0001, which added CLIN 0134 to the 2008 Contract. (*See* DA692–95). Newly-added CLIN 0134 provided a line item for Certified to "construct a variety of standard concrete targets at Rodgers Hollow to include forming and placing 5,000 psi concrete, reinforcing steel and required testing." (*Id.*). The delivery date shown for this modification was 15-May-2008 to 30-Apr-2009, while the effective date of the modification was May 21, 2008. (DA692–93).

Certified contends that it is entitled to summary judgment on work orders for construction of concrete targets at Rodgers Hollow that were allegedly improperly diverted under the 2008 Contract, as modified. (Pl.'s Mot. at 12–13). The United States also seeks summary judgment on a number of these work orders, alleging they fall outside the time range of the modification, exceed the maximum order limitations, or there exists a genuine dispute of material fact with respect to the value of the work that was performed. (Def.'s Cross-Mot. at 26–28). The Court agrees with the United States.

The effective date of the modification was May 21, 2008, meaning Certified was only entitled to work covered by the Modification if that work was ordered between May 21, 2008 and April 30, 2009. Because neither the 2006 nor the 2009 Contracts contained any provisions providing for work at Rodgers Hollow, Certified was not entitled to any work orders issued outside of the May 21, 2008 – April 30, 2009 time frame. Moreover, because the Modification did not alter any other provisions of the 2008 Contract, Certified was not entitled to any work that fell outside the order limitations threshold.

The United States claims that "[o]nly six delivery orders for targets at Rodgers Hollow fall within the time range of the modification and do not exceed the maximum order limitations," but argues summary judgment is inappropriate as to these work orders because of an alleged discrepancy as to the value of the diverted work. (Def.'s Mot. at 27). In response, Certified explains that, had the delivery order been awarded to Certified under the 2008 Contract, it "would have been obligated to price it using the unit prices applied to the 2008 Contract and the Government would have been obligated to pay that price," while a delivery order awarded to a JOC contractor was priced according to the job order contract. (Pl.'s Reply at 14).

The Court agrees that summary judgment is inappropriate as to these work orders. Certified's pricing of these work orders is material to whether the work fell within the Order Limitations provisions of the 2008 Contract. Because it is unclear whether the Order Limitations apply to the Government's estimate, the value of work calculated under Certified's pricing, or the value of work calculated under the JOC contractor's pricing, there exists a genuine dispute of

material fact as to whether the work orders subject to this challenge fall outside the scope of Certified's contracts. Consequently, summary judgment is denied as to the work orders subject to only an Order Limitations challenge.

5. Stand-alone Site Work During the 2006 Contract Term

The United States seeks summary judgment on 16 work orders for site work associated with the placement of concrete and asphalt or stand-alone site work during the effective period of the 2006 Contract. As explained above, the scope of work in the 2008 and 2009 Contracts was expanded to add "site work associated with the placement of concrete and asphalt or stand-alone site work (to include excavation, placing fill, finish grading, turf re-establishment, etc.) for completion of a total project in post areas at Fort Knox." (*compare* DA388, *with* DA601–02 *and* DA701). The 2006 Contract, however, did not provide for such site work, or list out representative "Site Work (Earth or Crushed Stone)" tasks. (*See* DA388–89). It is well established that "where several subjects of a class or group are enumerated and there are no general words to show that other subjects or items are included, it may reasonably be inferred that the subjects or items not named were intended to be excluded." *Design & Prod., Inc. v. United States*, 18 Cl. Ct. 168, 198 (1989). While Certified maintains that the 2006 Contract contained CLINs that could be used to cover this work, this does not mean Certified was entitled to perform all "site work" on Fort Knox.

It is true that the 2006 Contract makes several references to work that could reasonably be considered "site work," as that term is used in the 2008 and 2009 Contracts.[7] For example, Section 2K of the 2006 Contract's Technical Provisions, titled "Turf Establishment," provides specifications for "all labor and materials required for the soil improvements, seeding, and lawn maintenance." (DA442). Similarly, Section 2B, titled "General Construction," contains provisions for "Seeding and Sodding" and "Topsoil Placing," which state "[w]here required [this work] shall be in accordance with Section 212 of the KDOH [Kentucky Department of Highways] Specifications."[8] (DA405). When read in conjunction with the other provisions of the 2006 Contract, however, these references indicate that this "site work" was ancillary to Certified's paving work under that Contract. The scope of the 2006 Contract did not provide for stand-alone "site work." (*See* DA388). Thus, Certified was not entitled to orders for site work issued during the effective period of the 2006 Contract as identified in the attached spreadsheet.

6. Ginn Delivery Orders

The United States seeks summary judgment on 77 work orders awarded to the Ginn Group, titled "Make Repairs Found on Bids." Neither party has provided information about these orders and there is nothing to indicate that these work orders relate to concrete paving, asphalt placement or stand-alone site work. In response to the United States' Cross-Motion, Certified

---

[7] As the parties have not alleged the term "site work" is ambiguous, the Court, for purposes of this discussion, will use the term in a general sense to refer to activities such as seeding, turf-reestablishment, and placing fill.

[8] Section 212 of the KDOH provides specifications for "Erosion Control," and falls under the general "Earthwork" section. Ky. Dep't of Highways, Standard Specification for Road and Bridge Construction (Mar. 2004).

merely argues it "should have the right to attempt to develop [proof that these work orders fall within a Certified contract] through other sources." (Pl.'s Reply at 13–14). This argument is unavailing. After several extensions and modifications to the schedule, discovery closed on October 29, 2018. Thus, Certified had ample time to develop this proof and has not shown any reason why discovery should be reopened on this issue. In opposing a motion for summary judgment, the nonmovant must "submit or cite materials in the record showing that a genuine issue of material fact does exist." *Arrangaga v. United States*, 103 Fed. Cl. 465, 467 (2012) (quoting *Celotex Corp.*, 477 U.S. at 323–24). As Certified has failed to carry its burden in this regard, summary judgment in favor of the United States is appropriate as to these work orders.

In addition, Certified included several Ginn delivery orders twice in its list of allegedly diverted work orders. (*See* DA886–904). For example, W9124D-06-C-0040-THE GINN GROUP, Delivery Order No. L2 G00018 9 J ("Replace Stairwell Treads") is listed twice. (*See* DA892–93) (Work Diversion Worksheet). "[A] wronged party is typically not allowed to recover twice for the same harm." *S. Cal. Fed. Cav. & Loan Ass'n v. United States*, 422 F.3d 1319, 1332–33 (Fed. Cir. 2005). Thus, summary judgment is appropriate as to these duplicate entries.

7. Canceled Delivery Orders and Orders Certified Did Not Accept

Finally, the United States seeks summary judgment on three work orders that it alleges were canceled without any work being performed or that Certified acquiesced to having another contractor perform. In response, Certified "has conceded and will no longer pursue those claims." (Pl.'s Reply at 12; Pl.'s Resp. to DPFUF at 31, 51, 56). As such, summary judgment in favor of the United States is appropriate as to these work orders.

### IV.   Conclusion

For the reasons set forth above, the Court hereby **DENIES** Certified's Motion for Partial Summary Judgment and **GRANTS-IN-PART** and **DENIES-IN-PART** the United States' Cross-Motion for Partial Summary Judgment. The Court's rulings on the individual work orders subject to the parties' motion are provided in an appendix to this Opinion.

**IT IS SO ORDERED.**

s/      David A. Tapp
DAVID A. TAPP, Judge